# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

ZACHARY GRAVES,

     Plaintiff,

v.                                     Civil Action No. 3:09cv717

INDUSTRIAL POWER GENERATING CORP.,
d/b/a INGENCO,

     Defendant.

## MEMORANDUM OPINION

Before the Court are Defendant Industrial Power Generating Corporation's ("Ingenco") and Plaintiff Zachary Graves's Cross-Motions for Summary Judgment and Graves's Motion to Exclude Objectionable Evidence ("Motion to Exclude").[1] (Docket Nos. 30, 32, 34.) The motions have been fully briefed. The Court heard oral argument and the matters are ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 636(c). For the reasons that follow, the Court GRANTS Ingenco's Motion for Summary Judgment (Docket No. 30) and DENIES Graves's Motion for Summary Judgment (Docket No. 32). The Court DISMISSES for lack of subject matter jurisdiction Graves's wage discrimination claim and his retaliatory discharge claim. The Court DISMISSES WITH PREJUDICE Graves's discriminatory discharge claim. Graves's Motion to Exclude also is DENIED AS MOOT. (Docket No. 34.)

---

[1] Graves also filed Plaintiff's Motion to Amend Its Opposition to Memorandum in Support of Defendant's Summary Judgment ("Motion to Amend"). (Docket No. 38.) Because the motion is unopposed, the Court GRANTS Graves's Motion to Amend and DIRECTS the Clerk of Court to file the Plaintiff's Amended Opposition to the Memorandum in Support of Defendant's Motion for Summary Judgment, as well as Exhibits 1 and 2.

# I. Findings of Undisputed Facts

## A. Graves's Initial Employment with Ingenco and His Probationary Period

On August 6, 2002, Ingenco, an independent power producer, initially hired Graves, an African American, to work as an Operator in its Rockville, Virginia facility.[2] Ken Shannon, Ingenco's Director of Operations, and James Britton, Ingenco's Operations Manager, who is also an African American, made the decision to hire Graves and set his pay at $11.00 an hour. After working approximately six weeks, Graves resigned to pursue employment at a company called Infra-Metals. Infra-Metals eventually terminated Graves's employment due to lack of available work and its inability to pay Graves.

On February 5, 2004, Ingenco re-hired Graves to work as an Operator in its Charles City, Virginia facility. Graves started this second term of employment with Ingenco on February 9, 2004 with a pay rate of $11.00 an hour. Britton advised Graves that he would receive a pay increase upon the successful completion of his ninety-day probationary period. Graves initially reported to Supervisor Clyde Miller.

Ingenco paid a Caucasian Operator, who was hired around the same time as Graves's rehire, a starting rate of $11.00 an hour. Another African American Operator, also hired around the same time as Graves's rehire, received a starting pay rate of $13.50 an hour.

---

[2] Because the Court ultimately grants Ingenco's Motion for Summary Judgment, the Court recites and views these facts in the light most favorable to Graves, the nonmoving party. It should be noted that Graves attempts to raise numerous factual disputes. However, the vast majority of these factual disputes are not material because they are not outcome determinative. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the Court will only address the disputes that might be construed as material.

Graves complained to Debbie Spangler in Human Resources after learning that Ingenco paid an employee named "Matt,"[3] who was hired shortly before Graves's rehire, a starting pay rate of $12.50. Although Graves believes that Matt was a Caucasian, he only complained about Matt's higher pay rate because he "felt [Matt] didn't have the same amount of experience."[4] (Def.'s Mot. Summ. J., Ex. D, Graves Dep. ("Graves Dep.") 91:23-92:11.) Britton decided "to start Matt at [a] comparatively higher rate than certain Operators because Matt had an impressive pre-hire interview, and because [Britton] was aware that Matt was considering other offers." (Def.'s Mot. Summ. J., Ex. C, Decl. of James Britton ("Britton Decl.") ¶ 6.) After approximately a month, Matt left Ingenco to pursue other employment opportunities.

In early 2004, Ingenco hired Shannon's son-in-law, Joe Lanzarone, as a construction worker to assist with the completion of Ingenco's new Chesterfield facility. Lanzarone, a Caucasian, was paid a starting rate of $12.00 an hour. On March 13, 2004, Ingenco raised Graves's pay rate to $12.50 an hour. Effective August 1, 2004, Ingenco raised Lanzarone's pay rate to $12.50 an hour. Throughout his employment, Lanzarone engaged in several violations of work rules and received discipline. According to Graves, Lanzarone received preferential treatment because he was Shannon's son-in-law.

In June 2004, Miller, Graves's supervisor, initially completed Graves's ninety-day performance evaluation. "Because certain supervisors had a tendency to evaluate more strictly than others," Britton reviewed all Operator performance evaluations in an effort to implement a

---

[3] Matt's full name is not a matter of record.

[4] Graves argues that he raised the issue of wage disparity based on race during this conversation with Spangler. However, Graves can point to no evidence to support this allegation, and his own deposition testimony suggests otherwise.

consistent review standard between all Ingenco facilities. (Britton Decl. ¶ 9.) Britton altered

Graves's evaluation to include a negative comment about Graves's tardiness.[5]

### B.   Events Leading to Graves's First Complaint of Wage Discrimination on the Basis of Race and Various Other Complaints

Upon the completion of construction, Lanzarone began working as an Operator at the

Chesterfield facility. Kevin Smith, an African American, also was an Operator at the facility.

Graves transferred to the Chesterfield plant due to its convenient location to his home. Effective

January 29, 2005, both Lanzarone and Graves received merit increases, and Ingenco raised their

pay to $13.50 an hour.

Graves acted as Lead Operator at the Charles City plant and at the Chesterfield plant

when he first transferred. Around April 2005, Graves resigned from the position of Lead

Operator to work instead as an Operator after Shannon refused to give Graves a pay raise

associated with the Lead Operator position. Britton then awarded Lanzarone the Lead Operator

position and increased Lanzarone's pay to $14.00 an hour.

In June 2005, Graves complained to Spangler, telling her that African American

employees "felt" that Caucasian employees were being paid more.[6] (Graves Dep. 94:4-19.)

---

[5] Graves contends that his evaluation score was lowered because he was an African American. To support this allegation, Graves relies on Miller's belief that Graves's race was the reason Britton altered the evaluation. Pl.'s Opp'n Mem. Supp. Def's Mot. Summ. J. ("Pl.'s Opp'n") Ex. 3, Decl. of Clyde Miller ¶ 8.) However, Miller's Declaration contains no indication as to the foundation for his belief and fails to state that the statements are based on personal knowledge. In the absence of this foundation, the Court finds this evidence to be inadmissible hearsay. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (stating that affidavits submitted in opposition to summary judgment must be based on personal knowledge and cannot be conclusory).

[6] Ingenco argues that this is the first race-related complaint made by Graves, while Graves asserts that he made numerous prior race-related complaints, specifically in relation to

Effective November 2005, Ingenco hired Desi Gulley to replace Shannon as Director of Operations. At a December 1, 2005 meeting, Graves complained to Gulley about Britton's negative comment on his previous ninety-day performance evaluation.[7] Gulley agreed to withdraw Britton's negative comment. Throughout the remainder of Graves's employment with Ingenco, Graves made various complaints concerning his pay, overtime, work schedules, promotional opportunities, and safety-related issues.[8]

## C.    Implementation of Opportunity for Advancement

In February 2006, Gulley and Britton implemented Ingenco's Opportunity for Advancement, a new pay scale and promotion program which attempted to create a path for advancement and address wage compression problems. "Under this skill based program, Operators were classified at four levels (Operator I-IV), with specific training and goals to be met for advancement. Existing Operators were 'grandfathered' into the Operator II level, with the exception of two employees, one [African American] and one [Caucasian], who were designated

---

Matt and Lanzarone's higher start rate. Graves states, "This was an on-going conversation between Plaintiff and other African American workers and between Plaintiff and members of upper management well before . . . ." (Pl.'s Opp'n 8.) Because there is no evidence before the Court of any prior race-related complaints, the Court finds that the June 2005 complaint was the first race-related complaint made by Graves. Regardless, even if an earlier race-related complaint had been made, that fact would not change the ultimate outcome of this case.

[7] Graves now contends that this meeting never took place, but cites no evidence to support this allegation.

[8] In 2005, Graves was involved in organizing a Union, but the Union failed to come into existence after a majority of the employees voted against it. Without citing evidence, Graves now suggests that the employees attempted to organize the Union for the purpose of addressing the wage discrepancy between races. However, the uncontroverted evidence before this Court shows that the employees did not attempt to create the Union for race-related reasons. Thus, the Union-related activities are irrelevant to the issues before the Court.

as Operator III's." (Def.'s Mot. Summ. J., Ex. B, Decl. of Desi Gulley ("Gulley Decl.") ¶ 4.) Graves believed this new program was unfair because it was based in part on the employee's prior salary and performance evaluations.

After the implementation of this program, Graves contacted Raymond Yerly, Ingenco's Treasurer, to ask whether Caucasian employees were making more money than African American employees. After reviewing Ingenco Operators' pay rates, Yerly found that African American employees received on average a few pennies more than Caucasian employees.[9]

On April 21, 2006, Gulley and Gary Leakes, the Chesterfield Plant Supervisor, met with Graves and Smith to discuss various complaints regarding Ingenco's new wage and promotion scale. The issue of race discrimination was not raised at this meeting.[10]

Effective April 22, 2006, Ingenco promoted Graves to an Operator III, and Graves received a raise to $15.09 an hour. At this time, Lanzarone's pay rate was $14.49 an hour as an Operator II. Effective July 2006, Ingenco promoted Smith to the position of Chesterfield Plant Supervisor.

**D.    Race-Related Complaints to Gulley**

On September 8, 2006, Graves complained about racial discrimination to Gulley for the first time. Specifically, Graves complained that "employees had been paid differently in the past

---

[9] In his Motion to Exclude, Graves argues that a spreadsheet compiled by Yerly should be excluded. (*See* Def.'s Opp'n Pl.'s Mot. Exclude Objectionable Evid. Ex. E). The spreadsheet provides information about Ingenco Operators' start dates, pay rates, and race from 2004 until 2008. The Court finds the spreadsheet, which is not attached to Yerly's affidavit, to be unauthenticated, inadmissible hearsay and will not consider it as evidence.

[10] While Graves attempts to dispute this evidence, his own deposition testimony supports this finding. (Graves Dep. 70:7-10.)

6

and that he believed that [African American] employees had received less than [Caucasian] employees." (Gulley Decl. ¶ 10.) Graves also told Gulley that he had never received his pay raise at the completion of his ninety-day probationary period because he protested the negative comment Britton added to his evaluation. Gulley investigated this allegation and determined that Graves had indeed received a pay increase and that Britton's negative comment had no impact on his pay rate.[11] Gulley immediately contacted Yerly and Spangler to report this race-related complaint.

Smith completed Graves's performance evaluation for the December 2005 though December 2006 time period. Britton reviewed the performance evaluation and adjusted the evaluation in a positive manner. On January 18, 2007, Graves contacted Gulley to discuss his performance evaluation. During this conversation, Graves complained about Lanzarone's recent promotion to Operator III and resulting pay raise. Graves stated that, even though he had been told Ingenco did not discriminate, "'here we go again.'" (Gulley Decl. ¶ 14.) "This [wa]s the second and last time that Graves mentioned race in conjunction with his complaints to [Gulley]."[12] (Gulley Decl. ¶ 14.)

_____

[11] Graves argues that while he received a pay raise in March 2004, about a month after he was hired, he did not receive a pay raise once he completed his ninety-day probationary period. Without citing evidence to support his assertion, Graves also argues that he received the March 2004 pay raise to account for the wage discrepancy between him and Matt. Regardless, it is undisputed that Graves received a pay raise in March 2004 and that Gulley came to the conclusion that this raise was intended to constitute his ninety-day pay raise as well.

[12] Graves disputes that this was the last time he complained about a race-related issue, but the record before this Court is devoid of any other reference to a race-related complaint made by Graves.

Effective February 3, 2007, both Graves and Lanzarone received merit increases, resulting in a pay rate of $15.61 per hour for Graves and $15.67 per hour for Lanzarone. On March 2, 2007, Gulley and Britton had a teleconference with Graves to discuss Graves's concerns about the how the merit increases were calculated. "Graves did not complain in this meeting that the wage system was racially discriminatory." (Gulley Decl. ¶ 16.)

**E.     Events Resulting in Graves's Termination**

Employees at Ingenco self-report the hours they work on weekly timecards. Supervisors review Operator timecards for accuracy, and while supervisors correct inadvertent mistakes, Ingenco disciplines employees for purposeful falsification of a time card with the intent to be paid for time not worked. In 2002, Ingenco discharged two employees for purposefully falsifying their time cards.

On April 30, 2007, Graves and Lanzarone were assigned to work as Operators at the Chesterfield plant. Between 12:30 and 1:00 p.m., Lanzarone called Mike Guyette, Ingenco's Assistant Operations Manager, to complain about Graves's periodic absences from work. Lanzarone informed Guyette that Graves had been twenty minutes late to work, had left work for forty-five minutes to retrieve pain medication, had taken a twenty-five minute lunch break, and then had disappeared for forty minutes. At Guyette's request, Lanzarone faxed him a list of the time periods Graves had been absent from the plant that day. Lanzarone then called Spangler to file a "formal complaint" about Graves's absences. (Gulley Decl. ¶ 20.) Gulley was present in Spangler's office when she received this call from Lanzarone.[13]

---

[13] Graves objects to this evidence because he claims it is based on inadmissible hearsay. The Court finds that Lanzarone's statements are admissible for nonhearsay purposes, primarily its effect on the listener.

On May 1, 2007, Gulley and Britton investigated Lanzarone's allegations against Graves. Smith informed them that Graves did not get prior permission to leave the plant, but had called Smith afterwards to report that he had been late to work and had left the plant to retrieve pain medication.[14] The following day, Gulley verified Smith's statements and requested Smith to make a written statement. Gulley also asked Smith not to alter Graves's time card because Gulley wanted to see whether Graves would accurately document his absences.

---

[14] Graves now contends that testimony and other evidence from Smith suggests that Smith is unable to substantiate whether Graves said he was late to work. Graves also contends that Smith admitted that he had given Graves prior permission to get pain medication. Even presuming the validity of Graves's contentions, he appears to establish, at most, differing versions of Smith's own account of events.

Graves does not dispute that Smith submitted an affidavit (and a handwritten note) saying that Graves had apparently been late. Nor does he dispute that the statement confirmed that Smith had not given Graves permission to get painkillers. Smith's affidavit at the time these events unfolded states:

> [Graves] said something during this phone call about being late that morning, but I do not remember exactly what he said. At some point that day, [Graves] also mentioned needing to leave the plant to get some pain killers. I never gave [Graves] or anyone else permission to leave the plant during their shift on April 30, 2007. However, [Graves] called me upon his return to the plant after getting the pain medication offsite and I said it was "OK."

(Pl.'s Am. Opp'n Mem. Supp. Def's Mot. Summ. J. ("Pl.'s Am. Opp'n") Ex. 21, Aff. of Kevin Smith ¶ 3.)

Graves now offers to this Court a letter Smith wrote later stating that Graves received prior approval to retrieve pain medication. (Pl.'s Am. Opp'n Ex. 20; Mem. Supp. Pl.'s Mot. Summ. J. Ex. 33.) Graves attempted to authenticate this letter via Smith's deposition testimony, so the Court presumes its admissibility. Graves states that this letter was written "[s]hortly after Plaintiff's termination on May 8, 2007." (Mem. Supp. Pl.'s Mot. Summ. J. 8.) Thus, as discussed later, even presuming that this Court could consider the letter, it is not relevant because Smith relayed the opposite information to the decision-makers at the time of Graves's termination. *See Evans*, 80 F.3d at 960-61 ("'It is the perception of the decision maker which is relevant' . . . ." (*quoting Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980))).

On May 7, 2007, Graves submitted his time card for the preceding week, and aside from his lunch break, the time card did not reflect Graves's absences on April 30, 2007. That same day, Gulley and Britton arranged a meeting with Graves. Prior to meeting with Graves, Gulley and Britton agreed that Graves's employment would not be in jeopardy if Graves admitted that he had been late for work and absent for certain time periods but mistakenly forgot to indicate that on his time card. However, when asked about the events on April 30, 2007, Graves claimed that he arrived to work on time, that Smith pre-approved a ten- to fifteen-minute absence to retrieve pain medication, and that he had not left the plant at any other time aside from lunch. Gulley and Britton kept asking Graves about the events on April 30, 2007 "as though [they] wanted [Graves] to either change [his] mind or remember more than what [he] was telling [them]," but Graves refused to admit he was late or absent from the plant for an unauthorized period.[15] (Graves Dep. 121:4-6.) At the close of the meeting, Gulley and Britton told Graves that more investigation would be underway.

Later that day, Gulley, Britton, and Guyette met Smith in Petersburg, Virginia and directed Smith to document his April 30, 2007 conversations with Graves. Although Smith felt

---

[15] Graves argues that the evidence shows he was not late to work on April 30, 2007. (Pl.'s Am. Opp'n Ex. 23, Chesterfield Daily Logs.) However, the Court finds the daily log proffered by Graves to lack a proper foundation, rendering it unauthenticated, inadmissible hearsay.

Graves further contends that he was only absent for ten to fifteen minutes to retrieve pain medication. To support this assertion, Graves relies on an internet printout from mapquest.com. (Mem. Supp. Pl.'s Mot. Summ. J. Ex. 30.) The Court finds this evidence to be unauthenticated, inadmissible hearsay. It also is likely immaterial, given Ingenco's position that Graves did not have permission to leave for *any* period of time to get medication.

Graves also argues that during one of the alleged absences on April 30, 2007, he had simply gone to the other side of the plant to avoid confrontation with Lanzarone. None of the evidence cited, however, supports this assertion.

pressured into writing the statement, Smith wrote the statement in his own words, and the statement accurately reflected what Smith had verbally told Britton and Gulley throughout their investigation. Based on Smith's statements and based on knowledge of "other times in which Graves had misrepresented conversations he had had with [Gulley]," Gulley concluded that Graves was lying and had purposefully falsified his timecard. (Gulley Decl. ¶ 27.)

On May 8, 2007, Gulley and Britton met with Graves and advised him that his employment was terminated. Graves's employment was terminated after Ingenco concluded that Graves had "purposefully falsified his time card and then lied about his activities on April 30, 2007. In making this determination, [Gulley] credited Smith's version of the facts over that of Graves." (Gulley Decl. ¶ 30.)

During this termination meeting, Graves made allegations that on April 4, 2007 Lanzarone had left the plant without authorization and without reporting his absence on his time card. Gulley investigated these allegations and concluded that Smith had given Lanzarone prior permission to leave the plant on the date in question. Further, when Gulley confronted Lanzarone about this allegation, Lanzarone admitted his absence.

Initially, Ingenco hired a Caucasian employee to fill Graves's position. However, less than a week later, this employee was discharged and replaced with an African American employee.

**F.     Equal Employment Opportunity Commission ("EEOC") Administrative Investigation**

On October 30, 2007, Graves completed an EEOC Intake Questionnaire, an unsworn document. The questionnaire states that its purpose is to help the EEOC determine whether it

11

has jurisdiction over the complaint and includes a reminder that a charge of employment discrimination must be filed within the time limits imposed by law. On this form, Graves checked the boxes for discrimination based on "Race" and "Retaliation." Graves also indicated discrimination based on a "wage differential between African American and Caucasian employees." (Mem. Supp. Pl.'s Mot. Summ. J. Ex. 1 ("EEOC Intake Questionnaire").) Ingenco never received a copy of this questionnaire during the EEOC investigation.

On February 21, 2008, Graves filed a "Charge of Discrimination" with the EEOC. The EEOC charge stated the following:

> 1. I was hired on February 9, 2003, as a Production Operator. I progressed to Operator III. On May 8, 2007, I was discharged.
> 2. Mr. Desi Gulley, Director of Operations, stated I was discharged for falsifying my time sheet.
> 3. I believe I was discharged because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Gulley Decl. Ex. 5 ("EEOC charge").) The charge's "RACE" box was checked as the basis of discrimination, and the "RETALIATION" box was not checked. May 8, 2007 was listed as the earliest and latest date that discrimination took place. This Charge of Discrimination was served upon Ingenco at the beginning of the EEOC investigation.

On August 17, 2009, the EEOC dismissed the Charge of Discrimination and issued a Notice of Right to Sue. The EEOC reached the following conclusion:

> The evidence of record gathered in your charge does not support the allegation that you were subjected to discrimination based on your race by Respondent officials. All documentation which you submitted was carefully reviewed. It is clear from the evidence gathered and the record developed that respondent officials' decision to terminate you was based on your unauthorized absence from work, late reporting to duty, not being truthful regarding your absence and time and attendance documentation. There is no evidence to support that you were terminated based on

your race. Accordingly, the Commission was unable to conclude that a violation of the statute has occurred.

(Def.'s Opp'n Mem. Supp. Pl.'s Mot. Summ. J. Ex. 1, Second Decl. of Raymond Yerly ("Yerly Decl. II") Ex. 2.)

## II.  Procedural Posture

On November 13, 2009, Graves, proceeding pro se, filed a complaint against Ingenco in this Court. (Docket No. 1.)  Graves filed an amended complaint against Ingenco on March 9, 2010, alleging that Ingenco violated Title VII[16] of the Civil Rights Act by:  (1) engaging in racially discriminatory compensation practices; (2) terminating Graves in retaliation for his complaints of wage discrimination; and, (3) terminating Graves on the basis of his race. (Docket No. 3.)  On March 30, 2010, Ingenco filed an answer. (Docket No. 7.)  The parties consented to the jurisdiction of a magistrate judge, and the case was assigned to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c).  The parties filed cross-motions for summary judgment,[17] which have been fully briefed, and the Court held oral argument.

## III.  Standard of Review

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Anderson*, 477 U.S. at

---

[16]  42 U.S.C. § 2000e *et seq.*

[17]  Ingenco included proper *Roseboro* notice in its Motion for Summary Judgment, advising Graves of the necessity of filing a proper response. *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

248-50. Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex*, 477 U.S. at 322-24. These facts must be presented in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (*quoting Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (*citing Celotex*, 477 U.S. at 323-24).

## IV. Analysis

### A.    Exhaustion of Administrative Remedies

The Court must first consider whether Graves has properly exhausted his administrative remedies as to his wage discrimination claim and retaliatory discharge claim. Ingenco argues that Graves failed to include either claim in his EEOC charge and thus did not properly present his claims to the EEOC. Ingenco maintains that because of this failure, Graves did not place Ingenco on notice as to the wage discrimination or the retaliatory discharge claim before Graves commenced the instant lawsuit. This failure, Ingenco contends, deprives the Court of subject matter jurisdiction over Graves's wage discrimination and retaliatory discharge claim. The Court

agrees. Because Graves did not exhaust his administrative remedies, the Court DISMISSES Graves's wage discrimination claim and his retaliatory discharge claim for lack of subject matter jurisdiction.

### 1. Applicable Law

"Before filing suit under Title VII, a plaintiff must exhaust [his or] her administrative remedies by bringing a charge with the EEOC." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). If the plaintiff has failed to exhaust administrative remedies concerning a Title VII claim, the court is deprived of subject matter jurisdiction over the claim. *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).

The EEOC charge, which "must be in writing and verified under oath or affirmation under penalty of perjury," defines the scope of the plaintiff's right to sue. *Id.* "If a plaintiff's claims in [his or] her judicial complaint are reasonably related to [his or] her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in [his or] her subsequent civil suit." *Smith*, 202 F.3d at 247. "[T]he factual allegations made in formal litigation must correspond to those set forth in the administrative charge." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005). "[I]f the factual foundation in the administrative charge is too vague to support a claim that is later presented in subsequent litigation, that claim will also be procedurally barred." *Id.* In addition, courts bar claims that allege discrimination on a different basis, of a different type, or of a different scope than the plaintiff alleged in the administrative charge. *Id.* "At the same time, however, lawyers do not typically complete the administrative charges, and so courts construe them liberally." *Id.*

15

The purpose behind the exhaustion requirement is to ensure that the employer is put on notice of the alleged violations in hopes that the matter can be resolved out of court if possible. *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005).

## 2. Graves Failed to Exhaust His Administrative Remedies as to His Wage Discrimination Claim and His Retaliatory Discharge Claim

The Court cannot find that Graves exhausted his administrative remedies with respect to his wage discrimination claim or his retaliatory discharge claim.

First, the Court finds that these claims are not alleged in the EEOC charge and, based on the record before the Court, cannot be deemed reasonably related to any allegations in the EEOC charge. Although the alleged retaliatory discharge occurred before Graves filed his EEOC charge, he failed to check the "retaliation" box and he failed to allege retaliatory discharge, or facts that could reasonably be construed to constitute retaliation, anywhere on his EEOC charge.[18] *See Miles*, 429 F.3d at 492 (highlighting the plaintiff's failures to check the retaliation box and to mention retaliation in the narrative section of her EEOC charge); *Johnson v. Portfolio Recovery Assocs., LLC*, 682 F. Supp. 2d 560, 574-75 (E.D. Va. 2009); *Miles v. Goldschmidt Chem. Corp.*, No. 3:07CV444, 2007 WL 2973242, at *3 (E.D. Va. Oct. 9, 2007) (finding that the

---

[18] The United States Court of Appeals for the Fourth Circuit has recognized an exception when claims of retaliation may be raised for the first time in federal court. *See Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992). However, this exception to the exhaustion requirement does not apply when the alleged retaliation occurred before the plaintiff filed his or her administrative complaint. *Wilson v. Dimario*, No. 97-2252, 1998 WL 168346, at *2 (4th Cir. Mar. 31, 1998); *Keegan v. Dalton*, 899 F. Supp. 1503, 1511 (E.D. Va. 1995). Because all of the alleged acts of retaliation occurred before Graves filed his EEOC charge, the Court will not excuse his failure. *See Keegan*, 899 F. Supp. at 1511 (distinguishing between the need for administrative exhaustion for retaliatory acts occurring before and after filing an administrative charge).

plaintiff failed to exhaust administrative remedies on a failure to promote claim because the charge of discrimination contained no mention of the failure to promote).

Likewise, regarding his wage discrimination claim, the facts listed in the EEOC charge do not discuss anything other than Graves's termination and cannot be construed to allege wage discrimination. Further, the EEOC charge lists May 8, 2007, the date of Graves's termination, as the earliest and latest date that discrimination took place. The EEOC charge clearly does not indicate wage discrimination. *See Chacko*, 429 F.3d at 509 ("A claim will also typically be barred if the administrative charge alleges one type of discrimination–such as discriminatory failure to promote–and the claim encompasses another type–such as discrimination in pay and benefits.").

Second, these claims cannot be expected to follow from a reasonable administrative investigation of the EEOC charge, especially given the time limitation in the EEOC charge. *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002) ("Administrative investigation of retaliation . . . could not reasonably be expected to occur in light of [the plaintiff's] sole charge of race discrimination . . . ."). More tellingly, the record before this Court is bereft of any EEOC investigation into wage discrimination issues or into retaliation, all of which Graves tells this Court occurred well before his EEOC filing. Here, the EEOC simply concluded, "There is no evidence to support that you were terminated based on your race." (Yerly Decl. II Ex. 2.) *Compare Bryant*, 288 F.3d at 133 n.6 (noting that the written findings of the administrative agency do not reference retaliation but "conclude by stating, 'information and documentation presented revealed that [the plaintiff's] race was not a factor in the disciplinary action.'").

This Court finds the fact that Graves appears not to have sought investigation into these matters via the formal EEOC process an oddity of the record before it. Graves takes great pains to establish before this reviewing tribunal that he raised wage discrimination issues while at Ingenco, and that he thought retaliatory discharge – pre-EEOC filing – resulted. Indeed, the record suggests Graves even raised those issues early on in the EEOC process. For instance, Graves presents to this Court an EEOC Intake Questionnaire on which he checked off the Retaliation box and in which he alleges wage discrimination based on race.

However, the Court cannot find, under applicable law, that the EEOC Intake Questionnaire suffices to establish administrative exhaustion of Graves's wage discrimination or retaliatory discharge claim.[19] The questionnaire was a private, unsworn document between Graves and the EEOC. Its purpose was to help the EEOC determine whether it had jurisdiction over Graves's allegations, and the document included a reminder that a formal charge must be filed within the applicable time limit. Even if the Court found that this questionnaire sufficiently alleged wage discrimination and retaliation, nothing in this record suggests that Ingenco received notice of these allegations as part of the EEOC investigative process, because this Court has no record that any such investigation commenced. *See Miles*, 429 F.3d at 492 (finding private letter

---

[19] Graves's reliance on *Anthony v. Cnty. of Sacramento*, 898 F. Supp. 1435 (E.D. Cal. 1995) and *Sickinger v. Mega Sys., Inc.*, 951 F. Supp. 153 (N.D. Ind. 1996) is inapposite. These cases stand for the proposition that when the EEOC drafts the charge, substantially condensing and editing the plaintiff's complaints, the plaintiff's complaints define the scope of the charge. *Anthony*, 898 F. Supp. at 1443 n.5; *Sickinger*, 951 F. Supp. at 157. Here, no evidence before the Court suggests that the EEOC altered Graves's complaints.

Further, the Supreme Court of the United States's recent decision in *Fed. Express Corp. v. Holowecki*, 552 U.S. 389 (2008), does not affect the analysis in this case. The *Holowecki* Court held that an intake questionnaire accompanied by an affidavit could be construed as a timely filed charge. *Id.* at 405. Here, however, the intake questionnaire was an unsworn document that cannot be considered a charge under the *Holowecki* standard.

18

to EEOC alleging retaliation insufficient to cure the failure to allege retaliation in the charge);

*Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999) ("[I]t would be objectively illogical to view a private letter from a complaining party to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring a party to file charges with the EEOC is to put the charged party on notice of the claims raised against it.");

*see also Chacko*, 429 F.3d at 510 ("Congress intended the exhaustion requirement to serve the primary purposes of notice and conciliation . . . . This notice gives the employer an initial opportunity to voluntarily and independently investigate and resolve the alleged discriminatory actions . . . . [and] prevents the employer from later complaining of prejudice . . . ."); *Keegan*, 899 F. Supp. at 1511 ("Although [the plaintiff] raised some of the issues for a claim of retaliation as she began the process leading to a formal EEO complaint, she dropped that basis of her grievance before her complaint was filed.").[20] The record before this Court shows that Graves had last complained to his employer about wage disparity four months prior to his termination, and that he excluded those claims from his EEOC charge.

Thus, this Court cannot find that Graves's earlier complaints regarding race-based wage disparity reasonably relate to the charge of unlawful termination based on race when all the purportedly offending conduct predates the EEOC charge but was not included within the formal charge, or, based on information before the Court, any subsequent investigation.

[20] In *Harman v. Unisys Corp.*, No. 1:08cv542, 2010 WL 4257595 (E.D. Va. Sept. 17, 2010), a court in this district recently denied a motion to dismiss by finding that earlier instances of retaliation were reasonably related to acts of retaliation alleged in a later EEOC charge, in part because the acts of retaliation were "nearly the same" in both instances. *Id.* at *4. *Harman* does not change this Court's analysis because Graves pursued only one charge in his EEOC case, discriminatory discharge, and failed to raise (either via written allegations or by alleging earlier retaliatory conduct) any wage discrimination or retaliation.

Therefore, Graves did not exhaust his administrative remedies as to his wage discrimination claim or his retaliatory discharge claim. The Court accordingly GRANTS Defendant's Motion for Summary Judgment, DENIES Plaintiff's Motion for Summary Judgment, and DISMISSES these two claims for lack of subject matter jurisdiction.

### B.    Graves's Racially Discriminatory Discharge Claim

The Court now turns to the merits of Graves's discriminatory discharge claim, the sole claim over which this Court has subject matter jurisdiction. Graves alleges that Ingenco unlawfully terminated him on the basis of his race. The record here establishes that Graves has failed to demonstrate a prima facie case of discriminatory discharge. Even if Graves could present a prima facie case, he has failed to show that Ingenco's proffered legitimate, nondiscriminatory reason for the termination is pretextual. Thus, the record here establishes that Graves's racially discriminatory discharge cannot survive Ingenco's summary judgment motion.

### 1.    Applicable Law

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to . . . discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). When asserting a claim of employment discrimination pursuant to Title VII, Graves may prove his claim through direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003). When, as here, the case does not involve direct evidence of discrimination, Graves must rely on the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

20

Under *McDonnell Douglas*, the plaintiff must first demonstrate a prima facie case of his claim. *Id.* at 802. To establish a prima facie case of discriminatory discharge, Graves must show:

> (1) that he is a member of a protected class; (2) that he suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class.

*King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). After the plaintiff has established a prima facie case, the burden shifts to the employer to provide a legitimate reason for the adverse employment action. *McDonnell Douglas Corp.* at 802. The employer's burden to provide a legitimate, nondiscriminatory reason is one of production, not persuasion, and does not involve a credibility assessment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Although the burden of production shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Therefore, if the employer provides a legitimate, nondiscriminatory reason for an adverse employment action, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

The plaintiff need only produce sufficient evidence of the falsity of the employer's proffered reason for the adverse employment action. *Reeves*, 530 U.S. at 146-49 (rejecting the

"pretext plus" requirement, which required plaintiffs to show "'*both* that the reason was false, *and* that discrimination was the real reason' for the challenged conduct" (*Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377-78 (4th Cir. 1995) (*quoting St. Mary's Honor Ctr.*, 509 U.S. at 515))).[21] A plaintiff fails to demonstrate an employer's pretextual rationale for the adverse employment action "by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a 'genuine' dispute, the latter would fail to be 'material.'" *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) (internal citations omitted). Moreover, the plaintiff's own determination that the employer's proffered reason for the adverse action is pretextual carries no weight. *Holland*, 487 F.3d at 218 (*citing Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997), *overruled on other grounds by Nat'l R.R. Passenger Corp.*, 536 U.S. 101, 105 (2002)).

At the conclusion of the court's *McDonnell Douglas* analysis, a prima facie case combined with sufficient evidence of the employer's pretextual reason for the adverse employment action may permit a finding that the employer discriminated against the plaintiff. *Reeves*, 530 U.S. at 148.

### 2. Graves Has Failed to Demonstrate a Prima Facie Case for Discriminatory Discharge

Graves has met the first two elements of his prima facie case: Graves, an African American, is a member of a protected class, and Graves suffered an adverse employment action,

---

[21] Some courts in the Fourth Circuit appear to continue to apply the "pretext plus" analysis set forth in *St. Mary's Honor Center v. Hicks*. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 215 (4th Cir. 2007) (finding that plaintiff had failed to show that the employer's proffered reason for firing him was false where the plaintiff only offered as pretext evidence that the employer had changed his date of termination).

termination. *See Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 775 (4th Cir. 1997) (noting that termination is an adverse employment action). Graves, however, has failed to demonstrate the third and fourth elements of his prima facie case.

Graves cannot show that at the time Ingenco terminated him, he was performing at a level that met Ingenco's legitimate expectations. The evidence before this Court shows that Gulley had made a determination that Graves falsified his time card and subsequently lied about his whereabouts on April 30, 2007. Because of these actions, Graves was not meeting Ingenco's legitimate expectations. While Graves argues that this determination was wrong, Graves's own testimony cannot establish a genuine issue as to whether he was meeting Ingenco's expectations. *King*, 328 F.3d at 149; *Evans*, 80 F.3d at 960-61 ("'It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." (*quoting Smith*, 618 F.2d at 1067)).

Graves also has failed to demonstrate that his position was filled by a similarly qualified applicant outside the protected class.[22] When a position is filled by someone in the same protected class, this "ordinarily gives rise to an inference that the defendant did not fire the plaintiff because of [his or] her protected status." *Miles*, 429 F.3d at 488. While Ingenco originally hired a Caucasian employee to replace Graves, Ingenco discharged that employee less than a week later. Graves's position was then filled for the long term by an African American employee. Thus, Graves cannot show that his position was filled by someone outside his protected class. *See Cole v. Anne Arundel Cnty. Bd. of Educ.*, No. CCB-05-1579, 2006 WL 3626888, at *9 (D. Md. Nov. 30, 2006) (finding that an African American plaintiff could not

---

[22] The Fourth Circuit has recognized certain exceptions when a plaintiff need not demonstrate this fourth element. *Miles*, 429 F.3d at 486. However, none are applicable here.

satisfy this element where she was replaced by a Caucasian employee for a month and then the position was filled by an African American employee).

### 3. Graves Fails to Show Pretext

Even if Graves could establish a prima facie case of discriminatory discharge, Graves could not survive summary judgment because he has failed to show pretext. Pursuant to the *McDonnell Douglas* framework, once a plaintiff has met the requirements of a prima facie case, the defendant must then put forth a legitimate reason for the adverse employment action it took against the plaintiff. *McDonnell Douglas*, 411 U.S. at 802. In this case, Ingenco satisfies this burden. Gulley testified that he terminated Graves after concluding that Graves had "purposefully falsified his time card and then lied about his activities on April 30, 2007." (Gulley Decl. ¶ 30.) This reason rests on legitimate, non-discriminatory grounds.

Because Ingenco has offered non-discriminatory justifications for Graves's termination, the presumption of discrimination has "'drop[ped] out of the picture.'" *Reeves*, 530 U.S. at 143 (*quoting St. Mary's Honor Ctr.*, 509 U.S. at 511). The burden then shifts back to Graves to show evidence of pretext, and he fails to meet this burden. *See Burdine*, 450 U.S. at 253.

No evidence before the Court suggests that Gulley terminated Graves for any reason other than his belief that Graves falsified his time card and lied about it. Graves's attempt to prove that he did not falsify his time card and was not absent without authorization lacks relevance given the standard this Court must apply. The Court's sole concern is:

> "whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."

*DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (*quoting Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410-11 (7th Cir. 1997)). Graves's current arguments, based on Smith's new statement that contradicts the statement Smith gave to Gulley at the time of Graves's termination, cannot be weighed against Ingenco by the Court. The evidence before the Court shows that, at the time Gulley made the decision to terminate Graves, Smith had stated that Graves admitted to being late to work on April 30, 2007 and had admitted to leaving the plant during his shift without prior authorization. Graves does not dispute that Gulley had only this evidence to consider at the time he made his determination. This record supports Gulley's determination at the time that Graves falsified his time card and subsequently lied.

In a final attempt to show pretext, Graves points to allegedly similar actions taken by Lanzarone which did not result in termination. Graves claims that on April 4, 2007 Lanzarone left the plant without authorization, did not report his absence accurately on his time card, and was not terminated based on these actions. Gulley, however, testified that he investigated these allegations and concluded that Smith had given Lanzarone prior permission to leave the plant on the date in question. Further, Lanzarone admitted his absence when confronted. Graves again argues that Gulley's conclusions are incorrect, but "we must keep in mind that 'Title VII is not a vehicle for substituting the judgment of a court for that of the employer.'" *DeJarnette*, 133 F.3d at 298-99 (*quoting Jiminez*, 57 F.3d at 377). Thus, Graves has failed to prove that Ingenco's legitimate, nondiscriminatory reasons were pretextual, and his racially discriminatory discharge claim must be DISMISSED WITH PREJUDICE.

## C. Graves's Wage Discrimination Claim

In deference to Graves's *pro se* status and his apparent misapprehension of the upshot of some of the legal and factual events in this case, the Court will review some aspects of his claims on the merits, without making any findings given this Court's lack of jurisdiction. Even were this Court to look to the merits of Graves's wage discrimination and retaliatory discharge claims, the record here suggests that Graves could not prevail on summary judgment.

Graves contends that Ingenco discriminated against him on the basis of race by paying him less than similarly situated Caucasian employees. Graves first alleges racially discriminatory treatment in compensation, specifically referring to two instances:[23] (1) Graves resigned as Lead Operator after Shannon refused to give him a pay raise, and Lanzarone was then promoted to Lead Operator and given a pay raise; and, (2) Graves was hired at a starting pay rate of $11.00 an hour, while "Matt," a Caucasian employee, was hired at about the same time at $12.50 an hour.[24]

---

[23] Graves also argues that negative performance evaluations based on his race affected his pay rate. However, no evidence suggests that the one negative comment added on a performance evaluation affected Graves's pay in any manner.

[24] Ingenco argues that all of these claims are time barred because they fall more than 300 days prior to the initiation of the EEOC charge. *See* 42 U.S.C. § 2000e-5(e)(1); *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 (4th Cir. 2002) (noting that "[b]ecause Virginia is a 'deferral state,'" plaintiffs have 300 days from the last act of discrimination to file a retaliation charge with the EEOC) (internal citation omitted). Ingenco further argues that the Lilly Ledbetter Fair Pay Act of 2009 ("FPA") does not alter the time bar because Graves's allegations relate to discrete acts. The FPA, which took effect as if enacted on May 28, 2007, provides:

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

Graves also appears to allege discriminatory impact in compensation. As noted below, even if this Court had jurisdiction over this wage discrimination claim, the Court likely would find that this claim could not survive summary judgment.

### 1.  Discriminatory Treatment in Compensation

#### a.  Applicable Law

Title VII provides, "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). To succeed on a claim of racial discrimination in compensation in the absence of direct evidence, a plaintiff must first establish a prima facie case for wage discrimination. To establish a prima facie case of racial discrimination in compensation under Title VII, Graves must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action with respect to compensation; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).

Once a plaintiff has established a prima facie case of wage discrimination, the Court must then analyze the claim under the *McDonnell Douglas* burden-shifting scheme as already discussed above. *See McDonnell Douglas Corp.*, 411 U.S. at 802-03. Once the employer provides a legitimate, nondiscriminatory reason for the wage disparity, the plaintiff must show

---

42 U.S.C. § 2000e-5(e)(3)(A). "The FPA triggers anew the 300 day clock for filing a Title VII discriminatory compensation claim with each discriminatory pay period." *Johnson*, 682 F. Supp. 2d at 585. Because the compensation decisions raised by Graves had an effect on subsequent pay rates, the FPA would appear to prevent Graves's claim from being time barred.

that the reasons offered by the employer were a pretext for unlawful discrimination. *Burdine*, 450 U.S. at 253.

### b. Graves Could Not Establish a Prima Facie Case of Discriminatory Treatment in Compensation By Relying on Lanzarone's Promotion and Pay Raise

It is undisputed that Graves has established the first element of his prima facie case. However, even assuming, without deciding, that Graves has established the second and third elements of his prima facie case, Graves could not show that a similarly-situated employee outside the protected class received more favorable treatment.

The evidence shows that Lanzarone was the Director of Operation's son-in-law at the time of the promotion and pay raise at issue. Graves testified that Lanzarone received preferential treatment because he was Shannon's son-in-law. This familial relationship would prevent a Court from treating Graves and Lanzarone as similarly situated. *Holder v. City of Raleigh*, 867 F.2d 823, 826 (4th Cir. 1989) ("A racially discriminatory motive cannot, as a matter of law, be invariably inferred from favoritism shown on the basis of some family relationship."); *Lee v. City of Richmond*, 456 F. Supp. 756, 765-66 (E.D. Va. 1978) (finding that disparate treatment was not racially motivated but rather due to family friendship that served to discriminate against African American and Caucasian employees alike).

### c. Graves Could Not Show Pretext As to the Reason Why Matt Received a Higher Pay Rate

Even assuming that Graves could establish a prima facie case of wage discrimination based on Matt's higher pay rate, Ingenco has offered a legitimate, nondiscriminatory reason for Matt's higher pay rate. Britton testified that he offered Matt a higher pay rate based on an

impressive pre-hire interview and based on Britton's knowledge that Matt was considering other offers. While Graves argues that Matt did not have as much experience as Graves did, that could not sustain a showing of pretext. In the absence of any other evidence, Graves likely would fail to establish a claim of wage discrimination under Title VII.

### 2. Discriminatory Impact in Compensation

#### a. Applicable Law

To prove a prima facie case of discriminatory impact in compensation, a plaintiff must: (1) provide evidence showing statistical disparity between the wages of Caucasian employees and the wages of African American employees; (2) "identify the specific employment practice that is allegedly responsible for the disparity;" and, (3) prove that the practice has caused lowered wages for African American employees. *Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908, 912 (4th Cir. 1989).

Once a plaintiff has established a prima facie case of wage discrimination, the Court must then analyze the claim under the *McDonnell Douglas* burden-shifting scheme. Once the employer provides a legitimate justification for the practice at issue, the plaintiff must show that the justification "does not serve any legitimate employment goals of the employer." *Id.*

#### b. Graves Likely Would Fail to Establish a Prima Facie Case of Discriminatory Impact in Compensation

Graves does not present any evidence of a statistical disparity in wages between Caucasian and African American employees. Thus, this claim likely could not withstand summary judgment.

29

**D. Graves's Retaliatory Discharge Claim**

Graves finally contends that he was unlawfully terminated after he engaged in protected activity, opposing what he perceived to be unlawful, racially motivated wage discrimination.[25] Even if this Court had subject matter jurisdiction to hear this claim, the Court likely would find that this retaliatory discharge claim could not survive summary judgment because Graves fails to establish a prima facie case or show pretext.

**1. Applicable Law**

Section 704(a) of Title VII contains an anti-retaliation provision, which provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. 2000e-3(a). The anti-retaliation provision prevents "employer[s] from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). Courts interpret this provision broadly because the accomplishment of the goals of Title VII depends on the "cooperation of employees who are willing to file complaints and act as witnesses." *Id.* at 67.

To succeed on a retaliation claim in the absence of direct evidence, a plaintiff must first establish a prima facie case of retaliation. A plaintiff must show that: (1) the plaintiff was engaged in a protected activity; (2) the employer acted adversely against the plaintiff; and, (3) the

---

[25] Graves argues that he engaged in other protected activities as well, including Union organizing and making complaints to the Occupational Safety and Health Administration. Before this Court, however, his complaints about perceived wage discrimination are the only activities that might be construed to be protected activity under Title VII.

protected activity was causally connected to the adverse action. *Laughlin v. Metro. Wash. Airports*, 149 F.3d 253, 258 (4th Cir. 1998).

"To satisfy the third element, the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). This requires first that the plaintiff prove that the employer knew that the plaintiff had engaged in a protected activity; such knowledge "is absolutely necessary to establish the third element of the prima facie case." *Id.* However, "the fact that an employer's knowledge of the protected activity is necessary to finding a causal connection, does not mean that it is also sufficient for such a finding." *Verrinder v. Rite Aid Corp.*, No. 3:06cv00024, 2007 WL 4357595, at *11 (W.D. Va. Dec. 11, 2007) (*citing Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 n.9 (4th Cir. 1985)); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).

In addition to knowledge, the plaintiff must offer some evidence to establish causation. When temporal proximity provides the only evidence of causation, courts "uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (finding that action taken twenty months later, by itself, did not establish causality) (*quoting O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)); *King*, 328 F.3d at 151 n.5 (finding a gap of two months "sufficiently long so as to weaken significantly the inference of causation between the two events").

If the plaintiff cannot offer evidence of close temporal proximity between the protected activity and the adverse employment action, the plaintiff must offer additional evidence to establish causation. *Lettieri v. Equant Inc.*, 478 F.3d 640, 649-50 (4th Cir. 2007) (finding that

31

regularly occurring events following the plaintiff's complaint constituted retaliatory animus sufficient to establish causation) (*citing Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)); *O'Neal*, 237 F.3d at 1253. Courts require this additional evidence of causation because, just as a short time lapse may provide sufficient evidence of causality, "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Dowe*, 145 F.3d at 657; *see also Walker v. Johnson*, 501 F. Supp. 2d 156, 174 (D.D.C. 2007) ("Because approximately five months had elapsed between [the plaintiff's] EEO charge and the Letter of Reprimand, the EEO charge was too remote to establish the final element of [the plaintiff's] prima facie case.").

Once a plaintiff has established a prima facie case of retaliation, the Court must then analyze the claim for retaliation under the *McDonnell Douglas* burden-shifting scheme, as already discussed above. *See McDonnell Douglas Corp.*, 411 U.S. at 802-03. Once the employer provides a legitimate, nonretaliatory reason for the adverse employment action, the plaintiff must show that the reasons offered by the employer were a pretext for unlawful retaliation. *Burdine*, 450 U.S. at 253.

2.    **Graves Likely Would Fail to Establish a Prima Facie Case of Retaliation**

Graves has established that an adverse employment action, termination, was taken against him. However, even assuming that Graves's complaints about wage discrimination between African American employees and Caucasian employees constituted protected activity, Graves likely could not establish causation.

32

The undisputed evidence shows four times throughout Graves's three-year employment with Ingenco where Graves made a race-related complaint to supervisors: (1) in June 2005, Graves complained to Spangler about his belief that Caucasian employees were paid more than African American employees; (2) in or around February 2006, Graves complained to Yerly about the same belief; (3) on September 8, 2006, Graves reported the same complaint to Gulley; and, (4) on January 18, 2007, Graves again raised this complaint to Gulley.[26] Because Graves was not terminated until May 8, 2007, almost an entire four-month period passed between Graves's latest race-related complaint and his termination. This length of time, standing alone, could not provide proof of a causal connection. *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) ("In this case, at least three to four months separated the termination of [the plaintiff's] employment and the claimed protected activities. We find that this time period is too long to establish a causal connection by temporal proximity alone.").

Even if time were not an issue, Graves presents insufficient evidence to indicate a causal connection between his race-related complaints and his termination. "Clearly [Graves] believes that [he] was retaliated against, but that alone is insufficient." *Brackman v. Fauquier Cnty.*, 72 F. App'x 887, 894 (4th Cir. 2003). The only evidence Graves presents that might indicate a causal connection is that Gulley knew of Graves's race-related complaints at the time the termination decision was made. While knowledge is necessary to establish causation, it is not alone sufficient. *Id.* at 894 (*citing Gibson v. Old Town Trolley Tours of Wash., D.C., Inc.*, 160 F.3d 177, 182 (4th Cir. 1998)). Further, the evidence before the Court, contradicts an inference of a

---

[26] While Graves argues that he made ongoing race-related complaints to supervisors, he cites no evidence to support this assertion. Graves cannot create a material dispute to survive summary judgment through mere conclusory allegations.

causal connection. Subsequent to Graves's first two race-related complaints, Graves received a promotion to Operator III and a pay raise. Graves received another pay raise about two weeks after his first race-related complaint to Gulley. Thus, even if the temporal proximity between the two events created an inference of causation, this evidence would negate any such inference.

### 3. Graves Likely Would Fail to Show Pretext

Even if Graves could establish a prima facie case for retaliation, Graves could not survive summary judgment on this claim because he would likely be unable to show that Ingenco's legitimate, nonretaliatory reason for his termination is pretextual. Gulley testified that he terminated Graves after Graves purposefully falsified his time card and then lied about it. As discussed in the analysis of Graves's discriminatory discharge claim, Graves could not show that this legitimate, nonretaliatory reason is pretext for discrimination. This record suggests that Graves's retaliation claim could not succeed were this Court to address it.

### E. Remaining Sanctions Issue

A final matter still pending in this case is whether an award of expenses against Graves is appropriate under Federal Rule of Civil Procedure 37. Graves's noncompliance with discovery requests resulted in Ingenco filing a Motion to Compel. (Docket No. 19.) This Court granted Ingenco's Motion to Compel and ordered further briefing on appropriate sanctions. (Docket No. 26.) Ingenco filed a Memorandum of Law Regarding Sanction Amounts Awarded Pursuant to Defendant's Motion to Compel, requesting the Court to award $2,230.25 in attorney's fees. (Docket No. 28.) Graves did not file a response. For the following reasons, the Court finds that an award of expenses in this case would be unjust.

Under Rule 37, when a motion to compel is granted, "the court must . . . require the party . . . whose conduct necessitated the motion . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). However, Rule 37 further states that the Court must not order payment if "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(iii).

In this case, Graves is a pro se litigant. Pleadings by pro se litigants are held to less stringent standards than are pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 521 (1972). "[T]rial courts are encouraged to liberally treat procedural errors made by *pro se* litigants . . . ." *Bauer v. Comm'r of IRS*, 97 F.3d 45, 49 (4th Cir. 1996). Graves, of course, is nonetheless "subject to the time requirements and respect for court orders without which effective judicial administration would be impossible." *Ballard v. Carlson*, 882 F.2d 93, 96 (4th Cir. 1989).

Considering these parameters, Graves's pro se status, and the fact that this Court is dismissing his claims, the Court finds that an award of expenses under Rule 37 would be unjust. *See Diamond v. Bon Secours Hosp.*, No. WMN-09-865, 2010 WL 2696632, at *10 (D. Md. July 6, 2010). Thus, the Court DENIES Ingenco's request for an award of $2,230.25 in attorney's fees. (Docket No. 28.)

## V. Conclusion

For the foregoing reasons, the Court DISMISSES WITH PREJUDICE Graves's racially discriminatory discharge claim. Because Graves failed to exhaust his administrative remedies, this Court cannot exercise subject matter jurisdiction over Graves's wage discrimination claim or his retaliatory discharge claim. Thus, the Court DISMISSES those claims for lack of subject matter jurisdiction. Further, the Court GRANTS Ingenco's Motion for Summary Judgment

35

(Docket No. 30) and DENIES Graves's Motion for Summary Judgment (Docket No. 32).

Graves's Motion to Exclude (Docket No. 34) is DENIED AS MOOT, and Ingenco's request for

fees is also DENIED (Docket No. 28).

An appropriate Order shall issue.

/s/

M. Hannah Lauck

United States Magistrate Judge

Richmond, Virginia

Date: 1/5/11